#28158-a-SLZ
**2017 S.D. 67**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE ADOPTION
OF THE CHILD KNOWN AS
J. Q. P., a Minor Child

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHELLE K. COMER
Judge

\* \* \* \*

THOMAS E. BRADY of
Lynn, Jackson, Shultz
   & LeBrun, PC
Spearfish, South Dakota

Attorneys for petitioners and
appellants, K. H. & K. H.

ROSE ANN WENDELL
Pierre, South Dakota

JOAN SCHUELLER
Pierre, South Dakota

Attorneys for respondent and
appellee, G. L. P.

\* \* \* \*

CONSIDERED ON BRIEFS
ON OCTOBER 2, 2017
OPINION FILED **11/01/17**

#28158

ZINTER, Justice

[¶1.] Mother and Stepfather (Petitioners) petitioned to have Stepfather adopt Mother's child without the biological father's consent. The circuit court denied the petition, concluding Petitioners failed to show that the biological father had abandoned the child. We affirm.

*Facts and Procedural History*

[¶2.] G.L.P. (Father) and K.H. (Mother) are the biological parents of J.Q.P. Mother became pregnant with J.Q.P. in December 2007, three months after Mother and Father began dating. Both parents were living and working in Spearfish at the time, and Father moved in with Mother in 2008.

[¶3.] On August 4, 2008, Father and Mother were hosting a barbeque at their home for Father's friends in the Marines who were returning home. A pan in the kitchen caught fire, and Father suffered first, second, and third-degree burns on thirty percent of his body in the accident. Father's injuries required intensive burn care in Colorado, where he remained for approximately one month.

[¶4.] As a result of his injuries, Father was prescribed a strong narcotic and was required to wear a compression suit for one year. Skin grafts caused Father to have difficulty bending his arm and required the use of a walker. During this time, Mother cared for both Father and J.Q.P. Father, who was unable to work due to his injuries, cared for J.Q.P. when Mother was at work.

[¶5.] At some point, Father voluntarily stopped taking his pain medication so that he could drive to required medical appointments. However, he began experiencing increased pain, alternating insomnia and hypersomnia, cold sweats,

-1-

irritability, and mood swings.  In order to ease his pain, Father smoked marijuana prior to physical therapy appointments on three or four occasions.  Although Father initially denied marijuana use, he admitted to its use after Mother found marijuana residue in their garbage.  In November 2008, Mother demanded Father leave the home and he complied.

[¶6.]      Mother hired an attorney to draft a visitation agreement.  According to Father, the proposed agreement only permitted a single, two-hour supervised visitation period each week at Mother's parents' home.  Additionally, in order to obtain the visitation, Father would have been required to pay child support, be consistently employed for ninety days, pass drug tests, live independently in his own residence, and regularly attend counseling.  These terms differed from the unsigned visitation agreement in the record, which provided that Father would immediately have supervised visitation once a week for two hours and Mother and Father would revise visitation if Father complied with the aforementioned terms.  In any event, Father did attend one counseling session, but both he and the counselor agreed that counseling was not necessary because Father was working through a traumatic event from which it would take time to recover.  Father objected to the remaining terms and never signed the agreement.  He believed the terms were too stringent given his limited ability to work and his lack of money due to medical bills.

[¶7.]      In January 2009, believing he could not support himself in Spearfish, Father moved in with his parents and family in Colome and continued his therapy.  Colome is a four-hour drive from Spearfish.  Father testified he would frequently

text Mother telling her he wanted to see J.Q.P. Mother, however, said he could only have two hours of supervised visitation if he drove to Spearfish. In May 2009, Father scheduled a two-hour supervised visit at a facility in Rapid City. He exercised that visitation in a locked room under supervision.

[¶8.] Father continued to ask Mother about J.Q.P. and visitation, but Mother either denied his requests or demanded he come to Spearfish. In September or October 2009, Mother sought and obtained child support.* She also informed Father that if he attempted to contact her again, she would report him to law enforcement or obtain a protection order. She then blocked his cell phone number. Father ultimately quit trying to contact Mother after he was unable to reach her.

[¶9.] Father went to Spearfish in 2011 to attend the funeral of a friend. Mother also attended the funeral. Due to her previous threat to call law enforcement, Father did not speak with Mother and instead asked the friend's aunt to speak with Mother about Father seeing J.Q.P. Mother declined to let Father see J.Q.P. Father then tried texting Mother from a new number. He said he hoped they could be friends and apologized for everything, sharing his feeling that the accident had robbed them of their relationship. Father testified that Mother responded by saying, "You are completely delusional," and blocked the new number.

[¶10.] In July 2011, Father had a friend contact Mother about seeing J.Q.P. when Father would be visiting Sturgis. According to Father, Mother responded by saying Father was "still a loser and that was that." Father testified that he again stopped trying to contact Mother because he felt she "obviously didn't want to let

---

* Thereafter, Father consistently made child-support payments and caught up on all arrearages.

-3-

[him] see" J.Q.P. Father sent J.Q.P. a birthday card in September 2013, but he did not know if J.Q.P. received it. He admitted that he did not send any additional cards or gifts, but explained: "When somebody repeatedly tells you, no, that you're not going to be able to see your son, it's very frustrating and very demoralizing as a person to where you don't know if he's even going to get those gifts anyways."

[¶11.] In April 2016, Father received a notification from the Office of Child Support Enforcement that ordered him to put J.Q.P. on Father's health insurance. Father contacted Mother from another new number to ask for J.Q.P.'s social security number. Mother had since married Stepfather, and she asked Father if he would consent to changing J.Q.P.'s last name. Father refused and asked if he could see J.Q.P. According to Father, Mother replied he could "drive by and look in the car window while I drive by." Mother again blocked Father's new number.

[¶12.] In May 2016, Father retained an attorney to try and obtain a visitation order. Several months later, Mother and Stepfather filed this petition for a stepparent adoption. Petitioners contended that Father's consent was unnecessary because, among other things, Father had abandoned J.Q.P. The circuit court found that Petitioners failed to prove by clear and convincing evidence that Father abandoned J.Q.P., and the court denied the adoption. Petitioners appeal.

*Decision*

[¶13.] Generally, a child may not be adopted without the consent of the biological parents. *In re Adoption of Z.N.F.*, 2013 S.D. 97, ¶ 13, 841 N.W.2d 460, 465. However, parental consent may be waived if the parent has "abandoned the child for six months or more immediately prior to the filing of the petition." SDCL

25-6-4(2). Proof of abandonment requires "clear and convincing evidence that there has been by the parent a giving-up or total desertion of the minor child." *Z.N.F.*, ¶ 18, 841 N.W.2d at 466. "Whether a parent has abandoned a child within the meaning of SDCL 25-6-4 is a question of fact to be decided by the trial court, a decision that will not be overturned unless the finding is clearly erroneous." *Id.* ¶ 14, 841 N.W.2d at 465.

[¶14.]     Father does not dispute that he has not seen J.Q.P. since May 2009 or that his only contact since then is a single birthday card in 2013. Petitioners argue these facts demonstrated a lack of effort on Father's part to try and be a part of J.Q.P.'s life. To prove abandonment, however, there must be "an intent on the part of the parent to abandon and to relinquish parental obligations." *Id.* ¶ 18, 841 N.W.2d at 466. Here, the circuit court considered Father's minimal contact but found that it was insufficient to show that Father intended to abandon J.Q.P. The court found that Father tried to provide J.Q.P. love, care, and affection but that it was Mother's actions that prevented him from doing so.

[¶15.]     There is evidence in the record supporting these findings. As the circuit court noted, the lack of contact started when Mother demanded Father leave their home. The court also noted that thereafter, Father was unable to visit J.Q.P. due to Father's severe injury and his inability to work, afford housing, or provide for himself for two years—all of "which were requirements to see [J.Q.P.] in the proposal [Mother] presented to [Father] in 2009." Moreover, the court found that Mother's visitation requirements were "unrealistic" because they were based on her misplaced beliefs about Father's lifestyle. The court found:

> [Mother's] allegations against [Father] were based on her experiences with [Father] at his worst: after he had been seriously injured and when he was experiencing on-going pain, was financially devastated, and when he was depending upon [Mother] for assistance with his medical and day-to-day needs. At the same time, they had a newborn child and their relationship was ending. [Mother] erroneously used her experiences during those few months of [Father's] life as the basis for her belief [Father] is a drug and/or alcohol abuser, that he has mental and emotional issues and that he is generally an unfit parent.

[¶16.] Petitioners, however, contend that Mother did not prevent Father from contacting J.Q.P. and that Father's injuries do not explain his minimal contact after he recovered. Petitioners fail to acknowledge the effect of Mother's actions after Father moved to Colome. Although Father repeatedly contacted Mother about J.Q.P., the evidence shows that Mother blocked his calls, denied his requests, or demanded that he adhere to unreasonably restrictive terms. Moreover, the court found that Mother "has always known [Father] desired to have a relationship with [J.Q.P.] and [she] never took steps to encourage or accommodate that relationship." Instead, Mother threatened to report Father to law enforcement and blocked his number, thus preventing contact with Mother or J.Q.P. As the court noted: "[Mother] was the only person in the position to affect [J.Q.P.'s] relationship with [Father] because [J.Q.P.] has been in her care but, instead, she took steps to [sever] that relationship when she blocked [Father's] phone number." The evidence supports the court's finding that it was Mother's actions—not Father's alleged intent to abandon—that caused Father's minimal contact.

[¶17.] In sum, this is not a case involving a parent's unexplained failure to maintain contact with their child. *Cf. Z.N.F.*, 2013 S.D. 97, ¶ 20, 841 N.W.2d

at 466-67 (upholding finding of abandonment, even though mother deliberately concealed her whereabouts, because father obtained mother's address and knew her phone number but never attempted to contact the child). In this case, Father was recovering from a severe injury. He did not have the means to support himself, and he had to move away from J.Q.P. to obtain the financial and emotional support he needed. And during this time, Mother actively prevented Father from contacting her by threatening to report him to law enforcement and blocking his phone number. Once he recovered, Father still tried to indirectly contact Mother, and each time she turned him away. After these repeated rejections, Father lost hope that Mother would ever let him see his child. Nevertheless, he continued to support J.Q.P. by paying child support. And when he most recently attempted to force visitation by retaining an attorney, Petitioners proceeded with this adoption. Ultimately, this is a case where Father was trying to have a relationship with J.Q.P. but was thwarted by Mother. On this record, the circuit court did not err in determining that Petitioners failed to show clear and convincing evidence that Father had given up or totally deserted J.Q.P.

[¶18.] Affirmed.

[¶19.] GILBERTSON, Chief Justice, and SEVERSON and KERN, Justices, and WILBUR, Retired Justice, concur.